FILED

**IN THE UNITED STATES DISTRICT COURT** UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF NEW MEXICO** ~~~~ ~~~~MEXICO

JAN 2 5 2001

**SIRIA D. CHAVEZ,**

       **Plaintiff,**

*[signature]*
CLERK

**vs.**

       **Civ. No. 00-0333 LH/RLP**

**KENNETH S. APFEL, Commissioner,**
**Social Security Administration,**

       **Defendant.**

## UNITED STATES MAGISTRATE JUDGE'S
## ANALYSIS AND RECOMMENDED DISPOSITION[1]

### Issues and Standard of Review

1.    The matter before the Court is the Motion of Plaintiff, Siria Chavez, to Reverse the

decision of the Commissioner that she is not entitled to Disability Income Benefits (DIB)

and Supplemental Security Income (SSI) for a closed period, November 1, 1995 to July

7, 1997. She also seeks benefits for a nine-month trial work period commencing July 7,

1997.[2]

2.    Plaintiff filed applications for DIB and SSI on July 24, 1996, alleging a date of onset

of disability of November 1, 1995. (Tr. 56-58, 206) Her applications were denied initially

and on reconsideration (Tr. 24-31, 209-210) and by an Administrative Law Judge (ALJ)

---

[1]Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

[2] A trial work period permits qualified claimants to test their ability to work for up to nine months and still be considered disabled. **See** 42 U.S.C. § 422(c); 20 C.F.R. §§404.1592 & 416.992.



following a hearing. (Tr. 12-19). The Appeals Council declined to review the ALJ's decision. (Tr. 6-8).

3.      My review of the Commissioner's decision is limited to determining whether the correct legal standards were applied and whether the findings are supported by substantial evidence in the record viewed as a whole. **See Castellano v. Secretary of Health & Human Servs.**, 26 F.3d 1027, 1028 (10th Cir.1994). In conducting this review, I may neither reweigh the evidence nor substitute my judgment for that of the Commissioner. **Casias v. Secretary of Health & Human Servs.**, 933 F.2d 799, 800 (10th Cir.1991).

### Factual Background

4.      Plaintiff, a high school graduate with two years of college education, sustained a series of back injuries, the last occurring on November 1, 1995, while working as a certified nurse's assistant. (Tr. 74, 91, 140, 158, 186, 227, 233). The last injury was initially diagnosed as a back sprain with radiculopathy. (Tr. 140). She was placed on *Toradol*[3] for a two-week period  and referred to Dr. Lisa Perkowski, an internist. (Tr. 147, 150, 194).

5.      Plaintiff was seen on three occasions in Dr. Perkowski's office[4] for diagnosis and treatment. On November 17, 1995, low back strain was diagnosed based on subjective

---

[3]*Toradol*  is a nonsteroidal anti-inflammatory indicated for the short-term management of moderately severe acute pain that requires analgesia at the opiod level. It is not indicated for minor or chronic painful conditions. **1999 Physicians' Desk Reference** ("1999 PDR" herein) at 2716.

[4]Dr. Perkowski's treatment notes were dictated and initialed by her nurse practitioner, "JRT." (Tr. 148-150). See also Tr. 184 ("She was then evaluated by Dr. Perkowski's associate.") On two occasions, however, Dr. Perkowski also initialed the treatment notes (Tr. 148-149). The notes therefore reflect treatment and opinions of an acceptable medical source. 20 C.F.R. §§404.1513(a), 416.913(a)(6), (e); **Gomez v. Chater**, 74 F.3d 967, 971 (9th Cir. 1996)**cert. denied** 519 U.S. 881, 117 S.Ct. 209 (1996) ( a nurse practitioner working in conjunction with a physician constitutes an acceptable medical source).

complaints of pain, positive straight leg raising, and no evidence of malingering on objective testing. Plaintiff was placed in an off work status, given samples of *Relafen*[5], and advised to engage in normal household activities, minimal walking and no lifting or over-exertion. (Tr. 150). When evaluated five days later her physical examination had not changed. Her pain was located primarily in her low back, with occasional radiation down her thigh and "charlie-horses" in her back and buttock. She was continued on *Relafen,* and given a 5-day supply of *Valium* for muscle spasm. She was advised to return to light duty work the following week, with the anticipation that she could be at full duty by mid-December. (Tr. 149).

6.     Plaintiff returned to work at the end of November 1995. On December 1, 1995, she was treated at a hospital emergency room for worsening low back pain radiating to her right leg. Sciatic pain was diagnosed based on S-I tenderness on physical examination (Tr. 141).

7.     Plaintiff returned to Dr. Perkowski's office on December 5. Her examination was again unchanged from that of November 17. Plaintiff was by then scheduled to see an orthopedic specialist, Dr. Stern. Dr. Perkowski's office ordered a lumbar x-ray, and provided another work excuse for her, pending evaluation by Dr. Stern. (Tr. 148-149). The lumbar x-ray showed mild narrowing at L3-4, marginal spurring at multiple levels and Schmorl's nodes at several levels. (Tr. 145).

8.     Dr. Stern evaluated Plaintiff on December 14, 1995, for the purposes of "diagnosis

---

[5]*Relafen* is a nonsteroidal anti-inflammatory indicated for acute and chronic treatment of signs and symptoms of osteoarthritis and rheumatoid arthritis. **1999 PDR** at 3085-3087.

and treatment" at the request of her workers' compensation carrier.  (Tr. 154).  She

complained of low back pain and a pins and needles sensation in her right groin and right

thigh.  (Id.).  Dr. Stern recorded the following objective examination:

> The patient walks reasonably well on heels and toes.  There is minimal pain behavior.  On forward bend, there is pain in the lumbar spine, she makes a good effort.  On extension, she has increased pain.  Right and left bending does not cause pain.
>
> Distracted straight leg raise is negative bilaterally. Hallus valgus test bilaterally is negative.  Normal strength.  Dorsiflexion in both ankles normal.  Precedes (sic, perceives) light touch with a paperclip symmetrically, both lower extremities.  Sensation to symmetrical is intact (sic).  The patient states the numbness occurs occasionally, but not today.  He (sic) describes sensation as being in the posterior right thigh.
>
> The 90/90 knee flexion test bilaterally is without pain.  Straight leg raise on the left at approximately 80 degrees, produces pain in the left lower back.  The right straight leg raise produced pain at approximately 70 degrees in the mid lower lumbosacral region.  The patient states this is in the tail bone area, but when he (sic) points to the area it is approximately L5-S1 level.
>
> In the prone position, left knee flexion test and right knee flexion tests do not produce discomfort.  Heel of hand pressure at L5-S1, localized at L5-S1.  Vibratory testing is normal.

(Tr. 155-156).

Dr. Stern also evaluated x-rays which he read as showing degenerative arthritis at L3-4, L4-

5 and possibly L5-S1.  He diagnosed L4 right sided radiculopathy with groin pain, and

described Plaintiff as "straight forward and well motivated."  (Tr. 156).  He recommended

MRI in order to plan further treatment, and continued Plaintiff in an off-work status until that

evaluation was completed.  (Tr. 157).

9.      An MRI study was obtained on December 26, 1995.  It was read by the radiologist

as indicating congenital abnormalities of the pedicles at L1-2, L2-3, L3-4, and L4-5, with

mild L1-2 through L3-4 canal stenosis. No foraminal stenosis or focal disc protrusion was seen, although an anterior disc protrusion was noted at L3-4. (Tr. 151). Dr. Stern reviewed the MRI on January 18, 1996, which he interpreted as showing a disc herniation to the right of L3-4. (Tr. 152-153). He also conducted a physical examination, which indicated, ". . . no Waddell behavior[6]. The patient has a normal gait and localized pain to the high lumbar area. There are weak quads on the left side." He recommended disc excision at L3-4.

10.    Plaintiff was then referred to a neurosurgeon, Dr. Erasmus, on February 22, 1996, for a second opinion. (Tr. 158-160). Plaintiff complained of back and right leg pain, groin pain and occasional numbness in anterior thigh, right inguinal paresthesias and right leg weakness. Dr. Erasmus described Plaintiff as a very reliable and accurate historian, who exhibited no signs of symptom magnification. (Tr. 158). Dr. Erasmus conducted a detailed physical examination. He reviewed her MRI studies, which he interpreted as showing degeneration at L3-4, L1-2, and an abnormality of the L2-3 disc. He diagnosed degenerative disc disease with possible discogenic pain at multiple levels, and lumbosacral strain. He did not recommend surgery because he felt he did not know Plaintiff long enough to advise a treatment he described as "last ditch." He recommended that a third opinion be obtained, and that other measures, including physical therapy and nerve block, be taken before surgery was considered. An L3-4 paravertebral nerve block injection was

---

[6]Waddell signs derive from a study done by Dr. Waddell, a Scottish physician who examined the relationship between patients' subjective complaints and objective findings. **See Pierce v. Louisiana Maintenance Serv., Inc.,** 668 So.2d 1232, 1236 n. 1 (La.App.1996). The signs consist of tenderness, simulation, distraction, regional disturbances and overreaction. "Non-organic Physical Signs in Low Back Pain," Waddell G, et al.,**Spine**, 1980, 5:117-124. The presence of three of five Waddell signs may  indicate that  psychological factors are impacting a patient's condition Id.

administered on March 6, 1996.   (Tr. 164-165).   While in recovery, the treating

anesthesiologist noted that Plaintiff had good pain relief, but was not entirely pain free.  (Tr.

161).

11.     A third opinion was obtained on  March 27, 1996, when Plaintiff was evaluated by

Richard Castillo, an orthopedic surgeon. (Tr. 167-170).  Dr. Castillo recorded the following

history:

> Presently she complains about pain in her lower back which is aggravated by
> walking, squatting, sitting and household activities.  If she sits or lies down the pain
> gets better.  She is most uncomfortable while standing and more comfortable while
> sitting.  She has some occasional problems getting to sleep at night time.  She is very
> stiff and uncomfortable upon awakening in the morning, but after she moves around
> for a while it improves. Moderate activity also aggravates her symptoms . . . Her pain
> diagram shows constant throbbing ache through the low back and constant throbbing
> ache and numbness across the front of the right anterior thigh. Her pain diagram is
> probably normal.

(Tr. 167-168).

Dr. Castillo conducted a detailed physical examination and reviewed Plaintiff's MRI study.

He felt that she exhibited moderate symptom magnification, and that her MRI was

essentially normal, with no evidence of disc rupture. He diagnosed chronic mechanical low

back pain with no objective evidence of radiculopathy, and recommended non-surgical

treatment including lifestyle modification and exercise.  He also stated she could return to

work, but indicated that a functional capacity evaluation would provide more objective data

as to what she could do.  (Tr. 169-170).

12.     Plaintiff was  referred to Eva Pacheco, M.D., on April 30, 1996, for evaluation and

treatment of her low back pain. (Tr. 184-188).  Dr. Pacheco reviewed the examination and

treatment notes of all prior care providers, took a detailed history, and conducted a detailed

physical examination. She diagnosed chronic back pain with lumbosacral strain, no clinical evidence of nerve impingement, mild L1-4 congenital canal stenosis with no evidence of disc protrusion on MRI and assessed a Waddell score of 1:5. Dr. Pacheco referred Plaintiff to physical therapy for treatment of lumbosacral strain, considered obtaining EMG studies "should radiating symptoms" not improve and prescribed use of pain medication.

13.     Dr. Pacheco saw Plaintiff again on June 4, 1996. She had made no progress with physical therapy. Dr. Pacheco noted a mildly positive straight leg raising test on the right, prescribed additional medication and ordered EMG studies. She also stated, "I suspect patient will be unable to tolerate any work hardening type exercises since she has had limited progress in physical therapy." (Tr. 183).

14.     Plaintiff returned to Dr. Pacheco on June 18 complaining of low back pain radiating to her right buttock and thigh. Her EMG study was abnormal, suggestive of multilevel left and right nerve root irritation. Dr. Pacheco changed Plaintiff's medications and scheduled her for a functional capacities evaluation. (Tr. 181-182).

15.     The functional capacities evaluation obtained in July 1996 indicated:

> Patient was able to lift 15 pounds from knuckle to shoulder for 10 repetitions. Overhead lifting was up to 25 pounds, but this was only lifted seven times before she complained of discomfort. She was able to carry 40 pounds 30 feet as well as 35 pounds up to 100 feet. Isometric pushing was up to 65 pounds. Isometric pulling was up to 50 pounds. Bending, squatting, crawling and stooping were all limited secondary to low back pain. Patient was unable to perform these motions continuously. She was able to walk up to 2.5 minutes at a time without pain. She was able to sit and stand approximately eight minutes at a time.
>
> Based on these results, patient will fall into a sedentary work level. She will be unable to perform any stooping, kneeling, squatting or crawling type activities continuously.

(Tr. 179).

7

Dr. Pacheco prepared a work status report indicating that Plaintiff could return to work at light duty with additional restrictions: Squatting, bending, pushing and pulling "as pain permits," a 15 minute rest every two hours in order to stretch, and no mandatory overtime. (Tr. 180). Dr. Pacheco amended this evaluation in October 1996, stating that due to lumbosacral strain, canal stenosis, multilevel nerve root irritation and facet joint pain she was limited to sedentary work (lifting no more than 10 pounds occasionally or up to 5 pounds frequently) with the additional limitation that she could sit and stand only eight minutes at a time. (Tr. 195-196, 200).

16.    Plaintiff applied unemployment insurance in June 1996, and received benefits for a three-month period. (Tr. 234). She testified that she didn't feel she was able to work, but could not live on the reduced workers' compensation benefits ($145 per month) she was then receiving. (Tr. 235, 239). She was subsequently awarded workers' compensation benefits and advised she would have to pay back the unemployment insurance she had received. (Tr. 234, 239).

17.    Plaintiff sought the services of the New Mexico Department of Vocational Rehabilitation in November 1996. (Tr. 85). She was initially placed in a job training program for sedentary work on January 6, 1997, earing $100 per week. (Tr. 241). She started working full time as of July 7, 1997. (Tr. 84, 198, 231-232). She testified that she has difficulties in her job because

> My typing has slowed down a lot because my right hand goes to sleep and I can't sit for 10, 15, maybe 20 minutes at a time. I have to get up and walk around because my whole back and my hips and my right leg goes to sleep. I can't do any stooping. I don't push anything or don't pull anything . . . Lately I just work on papers so I can go and stop and get up and move around then

8

go back and sit down.

(Tr. 243).

## The ALJ's Decision

18.     The ALJ found that although Plaintiff had a severe impairment and symptoms producing medical problems, she exaggerated the symptoms and functional limitations she experienced.  He adopted the findings of a state agency non-examining physician in assessing her residual functional capacity, finding that she had the residual functional capacity for a limited range of light work (Able to lift 20 lbs. occasionally, 10 lbs. frequently, stand and/or walk for two hours and sit for six hours per eight hour shift with normal breaks, no kneeling, crawling or squatting, and limited ability to reach, push and pull.) (Tr. 16, 18 250). He posed a hypothetical question to a vocational expert containing these limitations. Based on the vocational expert's testimony, the ALJ found that Plaintiff had the residual functional capacity for the light jobs of social service aide, companion and parking lot attendant.  (Tr. 18, 250-251).   The ALJ also asked the vocational expert to assume an ability to lift 10 pounds occasionally, five pounds frequently, with all other factors remaining the same.  **See** 20 C.F.R. §§404.1567(b) and 416.967(b).  Based on the vocational expert's testimony, the ALJ found that Plaintiff had the residual functional capacity for the sedentary jobs of surveillance system monitor and order clerk.  (Tr. 18, 251).

## Issues Raised

19.     Two issues are raised by Plaintiff:  Whether the ALJ violated the treating physician rule, and whether the ALJ erred in his evaluation of Plaintiff's credibility.

## Legal Standards

9

20.    A treating physician may offer opinions concerning the nature and severity of a claimant's impairments, including physical restrictions caused thereby.   20 C.F.R. §§404.1527(a)(2), 416.927(a)(2).   The treating physician rule requires the ALJ to give controlling weight to the treating doctor's opinion about the nature and severity of a claimant's impairments, if the opinion is both well supported by clinical and diagnostic techniques and not inconsistent with other substantial evidence in the record. **See Bean v. Chater**, 77 F.3d 1210, 1214 (10th Cir.1995); **Castellano v. Secretary of Health & Human Servs.**, 26 F.3d 1027, 1029 (10th  Cir.1994).

21.    Courts ordinarily defer to the ALJ as trier of fact on credibility issues. **Thompson v. Sullivan**, 987 F.2d 1482, 1489 (10th Cir. 1993).   However, deference is not an absolute rule. **See Frey v. Bowen** 816 F.2d 508, 517 (10th Cir. 1987).   The ALJ's " '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of finding.'" **Huston v. Bowen**, 838 F.2d 1125, 1131, 1133 (footnote omitted) (10th Cir. 1988), **cited in Kepler v. Chater**, 68 F.3d 387, 391 (10th Cir. 1995).   The ALJ must "articulate specific reasons for questioning a claimant's credibility" where subjective pain testimony is critical. **Kepler v. Chater,**  68 F.3d at 391.

### Analysis

22.    The ALJ did not mention or in anyway discuss treatment received by Plaintiff at Dr. Perkowski's office, nor did he credit the work limitations imposed by Dr. Pacheco. He relied instead on the limitations described by a non-examining physician in assessing Plaintiff's residual functional capacity.

23.    Dr. Pacheco evaluated Plaintiff on numerous occasions and reviewed a functional

10

capacities evaluation conducted in July 1996. She ultimately determined that Plaintiff was capable of sedentary work, but that her ability to continuously sit or stand was limited to eight minutes at a time. "[T]he reports of physicians who have treated a patient over a period of time or who are consulted for purposes of treatment are given greater weight than are reports of physicians employed and paid by the government for the purpose of defending against a disability claim." **Frey v. Bowen**, 816 F.2d 508, 513 (10th Cir. 1987) quoting **Broadbent v. Harris**, 698 F.2d 407, 412 (10th Cir.1983). The ALJ gave no explanation for disregarding Dr. Pacheco's opinion as to Plaintiff's functional limitations in favor of that of a non-examining agency physician.

24.     Dr. Perkowski's records, and the opinions recorded therein, are significant in terms of evaluation of Plaintiff's credibility. Those records state that when initially seen there was no evidence of malingering on objective testing. This is consistent with the evaluations by Drs. Stern (no Waddell behavior) and Erasmus (no sign of symptom magnification). Dr. Castillo, who evaluated Plaintiff on only one occasion, did find evidence of symptom magnification (three of five Waddell's signs present). Dr. Pacheco, a treating physician, found Waddell score of 1:5, a score that is not indicative of symptom magnification. (See footnote 6, supra.). The evaluation of Dr. Castillo, who saw Plaintiff on only one occasion, does not constitute substantial evidence sufficient to allow the ALJ to ignore the opinion expressed in Dr. Perkowski records, and by all other treating and examining physicians, that Plaintiff was not exaggerating her symptoms.

25.     Based of the foregoing, I find that the ALJ violated the treating physician rule. I further find that this violation undermines his assessment of Plaintiff's residual functional

11

capacity and credibility.[7]

## Recommended Finding

26.    I find that the ALJ applied incorrect legal standards by failing to give controlling weight to the opinions of Plaintiff's treating physicians.  This error impacts  the ALJ's findings as to Plaintiff's residual functional capacity and credibility.  Accordingly, I recommend that Plaintiff's Motion to Reverse be granted, and that this matter be remanded to the Commissioner for additional proceedings to include:

A.    Reassessment of Plaintiff's residual functional capacity, in light of the opinion of her treating physician, Dr. Pacheco regarding her functional limitations;

B.    Reassessment of Plaintiff's credibility.

---

[7]The ALJ cited to additional  factors  in support of his credibility analysis.  I find, from a full review of the record, that many of the conclusions drawn by the ALJ have tenuous to no support. For example:

–Plaintiff has filed four workers' compensation complaints on her back.  (Tr. 17).

Congress drafted the social security statutes with the expectation that claimants would receive both workers' compensation and disability benefits for on-the-job injuries.  **See** 42 U.S.C. §424a;  **Richardson v. Belcher**,  404 U.S. 78, 82-83 (1971).  Plaintiff's seeking of such benefits, therefore, has no bearing on her credibility. **Cf. Eichel v. New York Cent. R.R.**, 375 U.S. 253, 255 (1963)(holding that "it would violate the spirit of the federal statutes if the receipt of disability benefits under the Railroad Retirement Act ... were considered as evidence of malingering by an employee asserting a claim under the Federal Employers' Liability Act").

–The Plaintiff reported good pain relief on March 6, 1996.  (Tr. 16).

The ALJ failed to consider that this occurred immediately after a nerve block injection.  (Tr. 161, 164-165).

–Plaintiff never mentioned an inability to sit for more than 10 minutes without her back going numb, and that her leg was going numb more often prior to the administrative hearing.  This was in conflict with a statement made on March 27, 1996, that sitting made her back feel better.  (Tr. 16).

The March 27, 1996 statement referred to is contained in the report of Dr. Castillo, and is internally inconsistent.  The functional capacities evaluation performed in July 1996, and accepted as valid by Dr. Pacheco,  recorded an inability to sit or stand for more than eight minutes at a time.  (Tr. 179, 195-196).  Plaintiff consistently complained of occasional numbness in her right thigh.  (Tr. 150-151, 154-156, 168, 186).

**RICHARD L. PUGLISI**
**UNITED STATES MAGISTRATE JUDGE**

13